**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

BARBARA J. ERITANO,                           CASE NO. CV F 04-6592 LJO

                        Plaintiff,             **DECISION ON SOCIAL SECURITY**
                                               **COMPLAINT**
        vs.                                    (Docs. 12-14.)

JO ANNE B. BARNHART,
Commissioner of Social
Security,

                        Defendant.
_____/

**INTRODUCTION**

        Plaintiff Barbara Eritano ("plaintiff") seeks this Court's review of an administrative law judge's

("ALJ's") decision that plaintiff is not disabled and is not entitled to disability insurance benefits under

Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 401-433.  Pursuant to 28 U.S.C. § 636(c) and

F.R.Civ.P. 73, the parties agreed to proceed before a United States Magistrate Judge, and by a March

16, 2005 order, this action was assigned to United States Magistrate Judge Lawrence J. O'Neill for all

proceedings.  Based on review of the Administrative Record ("AR") and the papers of plaintiff and

defendant Jo Anne B. Barnhart, Commissioner of Social Security ("Commissioner"), this Court DENIES

plaintiff's request to reverse the Commissioner's decision to deny plaintiff disability insurance benefits

or to remand for further proceedings.

1

## BACKGROUND

### Plaintiff's Personal Background

Plaintiff is age 64 and has a high school education and past relevant work as a route salesperson in the wholesale food and restaurant supply industry.  (AR 33, 34, 84, 93, 98, 439, 519.)

### Administrative Proceedings

On July 1, 1999, plaintiff filed her Application for Disability Insurance Benefits to allege disability since April 3, 1998 due to her status post-aortal-femoral bypass surgery, ventral hernia, osteoarthritis, thyroid cancer, spastic colon, and psoriasis.  (AR 80, 518.)  As plaintiff's application processed through the Social Security Administration ("SSA"), plaintiff also alleged depression and anxiety. (AR 518.)  With its November 4, 1999 Notice of Disapproved Claims, SSA denied plaintiff's claim and determined that her condition is not severe enough to prevent her to work.  (AR 65.)

On November 29, 1999 and December 10, 1999, plaintiff filed Requests for Reconsideration to claim she is unable to work due to pain.  (AR 69-72.)   With its February 17, 2000 Notice of Reconsideration, SSA denied plaintiff's claim and again determined that her condition is not severe enough to prevent her to work.  (AR 74.)

On March 21, 2000, counsel was appointed for plaintiff.  (AR 25.)  On March 22, 2000, plaintiff filed her Request for Hearing by Administrative Law Judge to claim she is "totally disabled." (AR 78.) After an October 25, 2000 hearing, the ALJ issued his December 5, 2000 decision to conclude that plaintiff's residual functional capacity permitted her to perform her past relevant work and that plaintiff is not disabled. (AR 18, 546.)

Plaintiff submitted to SSA's Appeals Council her December 15, 2000 Request for Review of Hearing Decision/Order to claim she is totally disable and cannot work.  (AR 8, 550.)  On September 27, 2002, the Appeals Council denied plaintiff's request for review.  (AR 4.)

On November 27, 2002, plaintiff filed an action to seek this Court's review of the ALJ's December 5, 2000 decision.  Based on the parties' stipulation, this Court issued its May 30, 2003 order to remand for the ALJ to obtain a current consultative mental status examination to clarify the nature and severity of plaintiff's mental impairment and supplemental vocational expert testimony whether a person limited to simple, repetitive tasks could perform plaintiff's semi-skilled past relevant work. (AR

1   555.)

2       On February 5, 2004, plaintiff's current counsel was appointed to replace her prior counsel. (AR

3   595-597.)  After an August 24, 2004 hearing, the ALJ issued his September 16, 2004 decision to

4   conclude that plaintiff's impairments do not prevent her to perform her past relevant work and that

5   plaintiff is not disabled.  (AR 524.)  The Appeals Council did not disturb the ALJ's September 16, 2004

6   decision to render it the Commissioner's final decision subject to this Court's review.

7                        **Medical History And Records Review**

8                          *Early Thyroid Cancer Treatment*

9       During the early 1990s, plaintiff treated for her thyroid cancer.  On May 23, 1990, plaintiff

10   complained of a visible palpable nodule in her left thyroid gland.  (AR 173.)  Plaintiff underwent a May

11   24, 1990 left thyroid lobectomy which revealed a small microfocus of papillary carcinoma.  (AR 171.)

12   On May 29, 1990, plaintiff underwent a total thyroidectomy and was diagnosed with mild lymphocytic

13   thyroiditis. (AR 156-157.)  A pathology report revealed neither papillary carcinoma nor benign tumors.

14   (AR 154.)  In the summers of 1990 and 1991, plaintiff underwent radioactive Iodine-131 therapy because

15   of local recurrence of papillary carcinoma of the thyroid. (AR 135, 137, 141, 144, 151, 152.)  A June

16   19, 1991 Iodine-131 whole body scan indicated remaining thyroid tissue and malignancy.  (AR 247,

17   249.)  A July 29, 1991 examination indicated plaintiff is extremely hypothyroid. (AR 241.)  August 8,

18   1991 notes reflect plaintiffs takes care of and is responsible for her elderly mother, who had suffered a

19   stroke. (AR 239-240.)  As of September 5, 1991, plaintiff was assessed with improved status (back on

20   thyroid hormone) and as mildly hypothyroid and stable post radiation for thyroid cancer.  (AR 238.)

21       On January 30, 1992, plaintiff reported she is doing fairly well.  (AR 226.)  A March 13, 1992

22   Iodine-131 bone scan was essentially normal with no evidence of metastatic disease. (AR 218.)  On July

23   13, 1992 and October 1, 1992, plaintiff reported that she is doing well with no complaints.  (AR 213,

24   215.)  July 13, 1992 notes reflect that plaintiff cared for her diabetic husband, her troubling mother and

25   her husband's mother.  (AR 215.)  As of February 8, 1993, plaintiff exhibited "no symptomatology."

26   (AR 206.)  An April 20, 1993 full body metastatic scan revealed no significant interval change from

27   plaintiff's March 13, 1992 scan.  (AR 187.)

28   / / /

***Bakersfield Family Medical Center***

During the 1990s, plaintiff treated at Bakersfield Family Medical Center to address many complaints, including Gastroesophageal Reflux Disease ("GERD"), right shoulder and elbow pain, sinusitis with congestion, back pain, dermatitis, anxiety, arthralgias, fatigue – nonspecific, hiatal hernia, Barrett's esophagus, foot neuroma, postnasal drainage, back pain, diarrhea, probable spastic colon, and hyperlipidemia. (AR469, 471, 473, 476, 477, 480,  481, 484, 486, 488, 489, 490, 492, 494, 495, 499, 501.)  On October 11, 1995, plaintiff noted that she is under much stress due to her husband's illness. (AR 488.)  January 4, 1996 notes reflect that her husband's illness causes anxiety and flare up of psoriasis.  (AR 486.)  April 24, 1996 notes state that plaintiff experienced sleep difficulty from anxiety and had not been taking her Xanax. (AR 484.)  On December 11, 1996, plaintiff reported that she was feeling overwhelmed caring for her ill husband and home, trying to work full time, etc. and that she felt as if she wants to cry all the time.  (AR 478.)  Plaintiff was assessed most likely with depression "which needs to be treated." (AR 478.)  Plaintiff's Xanax was increased to half tablet each in the morning and noon and one tablet at night.  (AR 479.)  Plaintiff was started on Paxil 20 mg once a day.  (AR 479.)

On January 8, 1997, plaintiff reported that she was doing better on Paxil and Xanax.  (AR 477.)  On March 14, 1997, plaintiff complained of stress and leg pain from her hips to ankles with movement and weight bearing.  (AR 473.)  April 16, 1997 notes reflect that plaintiff usually takes Xanax only once a day and frequently forgets to take it and that Paxil is helpful.  (AR 471.)  On December 12, 1997, plaintiff reported that she was under much stress due to her husband's deteriorating illness and her husband's total dependence on plaintiff.  (AR 468.)  Plaintiff noted that she is unable to retire in that she needs an income but is unable to adequately maintain her job.  (AR 468.)  Plaintiff complained of severe leg pain which is not debilitating.  (AR 468.)  Plaintiff explained she was hesitant to take her anti-depressant medication because it caused drowsiness and she feared not hearing her husband if he needed help.  (AR 468.)  Plaintiff was assessed with anxiety, depression and psoriasis and encouraged to use Xanax.  (AR 468.)  Plaintiff's Paxil was increased to 1½ tablets.  (AR 468.)

During 2000, plaintiff was treated for back, leg and elbow pain.  (AR 507-509.)

***Oak Tree Medical Group***

Plaintiff treated with Oak Tree Medical Group in Tehachapi, California.  On September 4, 1997,

plaintiff underwent a flexible sigmoidoscopy which reflected slight spasm throughout the colon but no sign of erythema or inflammation and no evidence of polyps.  (AR 347, 410, 686.)  Plaintiff was assessed with irritable bowel with some spasm evident.  (AR 347, 410, 686.)

Plaintiff's January 22, 1998 chest x-ray was normal.  (AR 405, 682.)  February 9, 1998 notes reflect that plaintiff was under much stress caring for her husband and working full time.  (AR 403, 681.)  February 11, 1998 left rib x-rays were normal.  (AR 402, 678.)  February 11, 1998 kidney, ureter and bladder x-rays revealed calcification in the pelvis, potentially in the course of the left ureter but otherwise unremarkable.  (AR 402, 678.)  On February 25, 1998, plaintiff complained of upper left quadrant discomfort and stress from caring for her invalid husband and her job.  (AR 400, 680.)  On June 25, 1998, plaintiff complained of exertionally related and bilateral leg cramping relieved with rest.  (AR 394.)  Plaintiff was assessed with new found one block intermittent claudication of lower extremities, probable abdominal aortic aneurysm, irritable bowel syndrome, hyperlipidemia, GERD with hiatal hernia, Barrett's esophagitis, and psoriasis.  (AR 393, 394, 675.)  June 25, 1998 x-rays revealed plaintiff's normal abdomen and intestinal gas pattern.  (AR 388, 675.)  A July 6, 1998 abdominal ultrasound revealed an upper abdominal aorta of normal size with no evidence of aneurysm.  (AR 671.)  A July 13, 1998 bilateral lower extremity arterial doppler ultrasound revealed moderate bilateral arterial insufficiency predominating at the right aortoliac junction and right ankle and dorsalis pedis.  (AR 383, 669.)  On July 22, 1998, plaintiff was assessed with periperal vascular disease of lower extremities with increasing intermittent claudication, irritable bowel syndrome, hyperlipidemia, GERD with hiatal hernia and Barrett's esophagitis and psoriasis.  (AR 380, 667.)  An August 18, 1998 CT scan of plaintiff's lumbar spine revealed degenerative changes resulting in mild canal stenosis at L3-4, L4-5, and to a lesser extent, L5-S1.  (AR 372, 659.)  September 9, 1998 notes reflect negative straight leg raises.  (AR 371, 657.)  October 5, 1998 notes reflect "much-improved circulation" to plaintiff's toes.  (AR 368, 655.)  On October 23, 1998, plaintiff denied claudication.  (AR 654.)  On November 20, 1998, plaintiff complained of back and stomach pain.  (AR 653.)  November 30, 1998 notes reflect that plaintiff experienced no abdominal pain.  (AR 650.)  December 1, 1998 x-rays revealed abnormal small gas pattern.  (AR 362, 649.)

March 4, 1999 notes reflect plaintiff's stable peptic ulcer disease ("PUD").  (AR 643.)  On June

22, 1999, plaintiff complained of a possible hernia and trouble bending over.  (AR 423, 638.)  On

August 27, 1999, plaintiff was assessed with a ventral hernia.  (AR 633.)  An August 30, 1999 thyroid

metastatic study was negative with no evidence of residual or metastatic disease.  (AR 420, 437, 630-

632.)  October 18, 1999 notes reflect plaintiff's ventral hernia.  (AR 628.)

March 29, 2000 notes reflect plaintiff's bilateral medial elbow pain, thoracic pain, and hip and

leg pain with walking.  (AR 626.)  May 10, 2000 and June 29, 2000 notes reflect plaintiff's ability for

only minimal walking due to back and leg pain.  (AR 624, 625.)  October 20, 2003 notes reflect

plaintiff's abdominal hernia, depression and discussion of disability letter.  (AR 620.)  At the request

of plaintiff's former counsel, Mark Pesche, D.O. ("Dr. Pesche"), a treating physician, prepared a brief

October 23, 2000 letter to conclude that plaintiff is totally disabled secondary to: (1) arterial

insufficiency of bilateral extremities with inability to walk and pain at rest; (2) degenerative arthritis of

the lumbar spine with inability to sit more than 10-15 minutes; and (3) ventral hernia with inability to

lift, push or pull without pain from herniation.  (AR 513, 618.)  Dr. Pesche further noted that plaintiff

was her husband's sole caretaker.  (AR 514, 619.)

On July 8, 2002, plaintiff complained of back pain, leg problems, persistent cough, hand and hip

arthritis, and knee pain.  (AR 612.)  Plaintiff noted that she attempted "to get on disability."  (AR 612.)

Peyton Riggs, D.O. ("Dr. Riggs"), the treating physician, found plaintiff in no acute distress and noted

plaintiff's walk without limp.  (AR 612.)  Dr. Riggs increased plaintiff's ibuprofen from 400 mg twice

a day to 800 mg twice a day, started plaintiff on glucosamine chondroitin, advised plaintiff to stop

smoking, and gave plaintiff Benadryl samples to assist with sleep.  (AR 612.)

Dr. Riggs' March 15, 2004 notes reflect that plaintiff presented "to get disability forms done."

(AR 611.)  Dr. Riggs completed a March 15, 2004 Residual Functional Capacity Questionnaire to

conclude that plaintiff is able to: (1) sit or walk less than 30 minutes at one time; (2) stand one hour at

one time; (3) sit five hours during an eight-hour day; (4) stand two hours during an eight-hour day; (5)

walk one hour during an eight-hour day; (6) lift/carry up to ten pounds frequently and up to 20 pounds

occasionally; (7) engage in simple grasping and fine manipulation; (8) occasionally bend and crawl and

frequently reach; and (9) use her feet for repetitive movements.  (AR 609-610.)  Dr. Riggs characterized

plaintiff's pain as moderate.  (AR 610.)

### *Bakersfield Memorial Hospital*

Plaintiff treated at Bakersfield Memorial Hospital.  A July 6, 1998 abdominal ultrasound revealed a normal-sized abdominal aorta with no evidence of aneurysm. (AR 345, 384.) September 22, 1998 chest x-rays revealed no evidence of acute cardiopulmonary disease. (AR 335, 343.) September 23, 1998 notes reflect that plaintiff ordinarily drives, shops, etc. (AR 297.) On September 23, 1998, plaintiff was treated for a history of bilateral leg claudication and was assessed with arterioarterial emboli, right lower extremity. (AR 325, 332.) Plaintiff was admitted for overnight observation and a vascular surgery consult and placed on Heparin. (AR 331.) On September 24, 1998, Roddie L. Reed, M.D. ("Dr. Reed"), a board-certified vascular surgeon, performed an aortobifemoral bypass on plaintiff. (AR 318.) September 25, 1998 chest x-rays revealed plaintiff's normal heart size and somewhat tortuous aorta. (AR 308, 341.)  On September 29, 1998, plaintiff was discharged and encouraged to stop smoking. (AR 293.)

### *Gregory Williams, M.D., Surgeon*

Gregory Williams, M.D. ("Dr. Williams"), performed a September 15, 1999 mesh repair of incisional hernia without complication. (AR 431.) September 27, 1999 notes reflect plaintiff was healing nicely. (AR 429.)

### *Tu Le, M.D., Consultative Internist*

Tu Le, M.D. ("Dr. Le"), an internist, conducted an October 2, 1999 comprehensive internal medicine examination. (AR 412.) Plaintiff complained of arthritis in the middle of her back and elbow to produce constant pain throughout the day and pain severe enough to awake her at night. (AR 412.) Plaintiff claimed inability to walk more than 20-30 steps secondary to middle back pain or to stand or sit more than five minutes. (AR 412.)  Plaintiff informed Dr. Le that she is able to perform all housework, cooking, cleaning and dishes for her husband along with hobbies of needlework and crafts. (AR 413.) Dr. Le's examination revealed plaintiff's normal finger-to-toe, fine finger movement, heel-to-toe walking and gait and negative Romberg. (AR 414.) Dr. Le found plaintiff's range of motion "highly flexible" including ability to flex "to the point of touching the palms of her hands to the floor." (AR 414.)  Dr. Le noted plaintiff normal muscle bulk, tone and strength in upper and lower extremities, including bilateral grip strength at 5/5. (AR 414.) As to plaintiff's functional assessment, Dr. Le opined:

Objectively on exam, despite the subjective complaint of back pain, she has extreme good range of motion and likewise has no neurological deficits. Examination of her elbows reveals normal range of motion, however, showed epicondylitis in the medial area bilaterally. With regards to her bifem bypass, she has no symptoms of claudication and has good peripheral pulses. Given the objective evidence, there would be little to support today any limitations in sitting, standing, and walking in an eight-hour workday, lifting and carrying 50 pounds on occasion, any postural limitations or manipulative limitations as well. (AR 415.)

### *Residual Physical Functional Capacity Assessment*

Anne M. Khong, M.D. ("Dr. Khong"), completed a November 3, 1999 Residual Physical Functional Capacity Assessment to conclude that plaintiff is able to: (1) lift/carry 50 pounds occasionally and 25 pounds frequently; (2) stand/walk about six hours in an eight-hour workday; (3) sit about six hours in an eight-hour workday; and (4) push/pull subject to the lift/carry limitations. (AR 442.) Dr. Khong found neither postural, manipulative, visual, communicative, nor environmental limitations. (AR 444-445.)

### *Lina Shuhaibar, M.D., Consultative Psychiatrist*

Lina Shuhaibar, M.D. ("Dr. Shuhaibar"), is a psychiatrist and conducted a January 22, 2000 comprehensive psychiatric evaluation of plaintiff. (AR 438.) Plaintiff chiefly complained of depression and anxiety. (AR 438.) Plaintiff reported to Dr. Shuhaibar that she is the primary caretaker for her husband whose multiple medical problems include diabetes, congestive heart failure, and below-the-knee amputation. Plaintiff further noted that she "stays in her room all day, isolates, and has poor sleep." (AR 438.) Dr. Shuhaibar's examination revealed plaintiff's logical and goal-directed thought process and good insight. (AR 439.) Dr. Shuhaibar found plaintiff is able to maintain daily living activities, cares for herself and her husband, cooks and performs household chores. (AR 440.) Dr. Shuhaibar diagnosed major depressive disorder, severe, single episode and concluded that plaintiff's problem "is treatable" with good likelihood of recovery. (AR 440.) Dr. Shuhaibar noted that plaintiff's condition "is likely to improve in the next 12 months, given adequate pharmacotherapy and psychotherapy." (AR 440.) As to functional assessment, Dr. Shuhaibar opined:

She has the ability to perform simple and repetitive tasks without any problems. She can accept instructions from supervisors and interact with coworkers and the public. . . . She is able to do work activities on a consistent basis. She can maintain regular attendance in the workplace. (AR 440.)

***Psychiatric Review Technique And Mental Residual Functional Capacity Assessment***

Marina C. Vea, M.D. ("Dr. Vea"), a psychiatrist, completed a February 15, 2000 Psychiatric Review Technique to note minimal presence of features of affective disorders.  (AR 454.)  Dr. Vea concluded plaintiff had slight/seldom restriction of daily living activities, difficulties in maintaining social functioning, and deficiencies of concentration, persistence or pace.  (AR 458.)

Dr. Vea completed a February 15, 2000 Mental Residual Functional Capacity Assessment to conclude that plaintiff is generally not significantly limited in understanding and memory, sustained concentration and persistence, social interaction, and adaptation.  (AR 460-461.)  Dr. Vea found that plaintiff "has the ability to perform simple and repetitive tasks without any significant mental problems."  (AR 462.)

***S.A. Manohara, M.D., Consultative Psychiatrist***

S.A. Manohara, M.D. ("Dr. Manohara"), a board certified psychiatrist, conducted an October 20, 2003 consultative examination and prepared a report of the same date.  (AR 605.)  Initially, plaintiff denied psychiatric problems, but on further questioning, plaintiff reported that she suffered from depression relating to care for her diabetic amputee husband with renal failure.  (AR 605.)  Plaintiff further noted that during March to July, 2002, two stepdaughters and a son died.  (AR 605.)  Plaintiff further noted that another son serves a six-year prison sentence.  (AR 606.)  Plaintiff's symptoms include crying easily, feelings of hopelessness and worthlessness but not suicidal, loss of interest in activities, appetite loss with varied periods of excessive eating, and memory and concentration problems.  (AR 606.)  Plaintiff explained that physical pain and disability exacerbates her depression and that she provides total care for her wheelchair bound husband.  (AR 606.)  Plaintiff reported that in 1998, she quit her food service job because she could not walk around in restaurants and her legs and back started to hurt.  (AR 606.)  Plaintiff noted that in 1999, she tried to work at Right Aid but could not physically handle the work and applied for many jobs but was not hired.  (AR 606.)

On examination, Dr. Manohara found plaintiff's thought process logical and goal oriented with no evidence of thought disorder, hallucinations or delusions.  (AR 607.)  Plaintiff did not perceive a significant psychiatric problem and blamed her symptoms on the situations and trauma she experienced during the past year exacerbated by her physical limitations, which cause stress to care for her husband.

(AR 607.)  Dr. Manohara found plaintiff's affect appropriate to thought content and her memory, concentration, cognitive function, judgment and insight generally intact.  (AR 607.)  Dr. Manohara diagnosed major depression, mild to moderate, single episode, without psychotic features and assigned a 50 Global Assessment of Functioning ("GAF").  As to plaintiff's abilities, Dr. Manohara opined:

> The patient is able to understand, remember, and carry out short and simple instructions, and can understand and remember detailed instructions.  The patient has slight difficulty in carrying out detailed instructions because of combination of her major depression, physical symptoms, and disability.  She is able to make judgment on simple work-related decisions. . . .  In spite of her numerous losses and chronic pain, and demands of taking care of her husband, her depression is not significantly affecting any of the above functions.

> She is able to interact appropriately to public, to supervisor, and to coworkers.  She has moderate restrictions in responding appropriately to work pressures in an usual work setting because of her ongoing chronic pain and physical disability, which makes her depression worse.  She has moderate problems responding appropriately to changes in routine work setting.

> . . . Her physical symptoms and pain bring onset of depression, which is manifested by crying spells, although in the interview the patient did not have any crying spells and interacted well with the interviewer.  She showed mild to moderate depression during the interview.  The above assessment is based on the self-report by the patient and to a lesser extent by the clinical findings of mild to moderate depressed mood.  (AR 608.)

### *Medications*

Plaintiff's medications have included Levoxyl 1.75 mg, Paxil 20 mg, Premarin .625 mg and .9 mg, Ditropan 5 mg, Lescol 20 mg, Xanax 10 mg, Librax, Oxybutynin 5 mg, Etodolac 500 mg, Glucosamine Chondroitin, Iduprophia, Maalox, Zephrex, Pepcid, aspirin 81 mg, and an anti-diarrheal. (AR 97, 131-133, 604.)

### **Plaintiff's Activities And Testimony**

### *Reports And Questionnaires*

Plaintiff completed a June 27, 1999 Disability Report Adult to claim that she is limited in her ability to work from aorta-bifemoral bypass and hernia, hiatal hernia, thyroid cancer and osteoarthritis. (AR 92.)  Plaintiff further claimed that her condition and resulting pain prevent her to lift, bend, stand for long, walk far and concentrate.  (AR 92.)  Plaintiff stopped working as a wholesale food service marketing associate on April 3, 1998 based on mutual agreement arising from illness and inability to perform her job properly.  (AR 92.)

Plaintiff completed a November 22, 1999 Reconsideration Disability Report to claim she

experienced increased elbow and back pain and is unable to lift/carry more than ten pounds or stand. (AR 108.) Plaintiff noted her additional symptoms of depression, mood swings, crying, shakes, leg and foot numbness, and tingling. (AR 108.) Plaintiff is unable to blow dry and curl her hair because her arms and elbows ache and she experiences shooting pain. (AR 110.) Plaintiff is unable to clip her toe nails because back pain prevents her to bend. (AR 110.) Plaintiff is unable to vacuum or bend to dust and must sit frequently to relieve leg and back pain. (AR 110.)

Plaintiff's son Russell Eritano completed a December 22, 1999 Daily Activities Questionnaire (Third Party Information) to note that plaintiff spends a typical day caring for herself and her severely ill husband by cooking, cleaning, administering medications, and monitoring blood sugar levels. (AR 114.) Caring for plaintiff's husband is a 24-hour job in that plaintiff's husband has severe diabetes with congenital heart failure and renal problems and is a diabetic amputee. (AR 114, 117.) Arthritic condition prevents plaintiff to perform simple grooming, heavy cleaning, and moving heavy objects. (AR 115.) Plaintiff prepares and cooks her meals. (AR 115.) Plaintiff shops and does need assistance. (AR 115.) Plaintiff performs light cleaning and laundry. (AR 116.) Plaintiff has a driver's license and drives. (AR 116.) For recreation, plaintiff watches television, reads and plays video games. (AR 116.) Plaintiff leaves her home only for shopping and doctor's appointments. (AR 118.) Plaintiff is forgetful when she is interrupted. (AR 118.) Plaintiff leaves her bedroom only to assist her husband or to perform daily tasks. (AR 118.) Plaintiff seems confused and is often depressed. (AR 118.) Plaintiff is unable to sit or stand for any length of time. (AR 119.)

Plaintiff completed a December 27, 1999 Daily Activities Questionnaire to note that she lives with her family in a home. (AR 120.) Plaintiff spends an average day helping her husband fix meals and get his "meds" and staying in her room. (AR 120.) Plaintiff experiences elbow, wrist and back pain. (AR 120.) Plaintiff prepares meals, including a normal dinner. (AR 121.) Plaintiff is able to clean for short periods before needing to sit to straighten her back. (AR 121.) Plaintiff loads the washer, dryer and dish washer. (AR 121.) Plaintiff needs help with heavy cleaning, including windows, floors, carpets and walls. (AR 121.) Plaintiff's activities and hobbies include Super Nintendo, crocheting and embroidery. (AR 121.) Plaintiff tries to read mystery books each night. (AR 122.) Plaintiff leaves her home "only when necessary." (AR 122.) Plaintiff walks outside to do what is needed, such as watering

plants and taking out trash.  (AR 122.)  Without assistance, plaintiff drives to the shop, bank, post office and doctors' offices.  (AR 122.)  Plaintiff's husband is a diabetic amputee who needs dressing changes.  (AR 123.)  Plaintiff is unable to bend due to hiatal hernia and to walk more than ten yards without stopping.  (AR 123.)  Plaintiff is unable to perform heavy house work.  (AR 123.)  Plaintiff easily loses her train of thought.  (AR 124.)  Plaintiff experiences difficulty to complete chores because she needs to sit to straighten her back or forgets what she is doing.  (AR 124.)  Plaintiff does not like being around people and is unable to stand/walk for longer time periods.  (AR 124.)  Bending is painful and lifting heavy items is impossible.  (AR 124.)  Plaintiff tried but was unable to find a job since her bypass surgery.  (AR 124.)

Plaintiff completed a March 14, 2000 statement to note her severe hand and elbow pain, limited hand use and mobility, and severe back pain.  (AR 130.)  Plaintiff is unable to sit for more than five minutes, stand for more than 15 minutes or walk "too long."  (AR 130.)

### Plaintiff's October 25, 2000 ALJ Hearing Testimony

Plaintiff testified at the October 25, 2000 ALJ hearing that she lives with her husband who is a diabetic amputee with renal and congestive heart failure.  (AR 32-33.)  Plaintiff last worked April 3, 1998 in food sales in a full-time position which she has held for five years.  (AR 34.)  Plaintiff's duties included demonstrating and delivering food products, taking orders and assuring customers received orders.  (AR 34.)  The job required plaintiff to lift 50 pounds several times a week.  (AR 35.)  Plaintiff and her employer mutually agreed that plaintiff leave because back and leg pain and hand and elbow arthritis prevented her to deliver product.  (AR 37.)  Prior to her food sales position, plaintiff performed secretarial and bookkeeping work for her husband's trucking and food service businesses but was not paid.  (AR 35-36.)

Plaintiff underwent an aortal bifemoral bypass in September 1998 which relieved plaintiff's symptoms in her lower extremities.  (AR 38.)  Until five months prior to the hearing, plaintiff was able to walk, take a shower without insistent pain, and assist her husband more.  (AR 48.)

Arthritis affects plaintiff's back, hips, elbows and hands.  (AR 39.)  Plaintiff received no pain treatment at the time of the hearing other than Tylenol and Paxil.  (AR 39.)  Plaintiff has a "wide open" hiatal hernia which produces gastric backup when she bends over.  (AR 40.)  Plaintiff's psoriasis is

"controlled very easily." (AR 40.) Plaintiff has a spastic colon which produces diarrhea and had a complete thyroidectomy in 1991 due to cancer. (AR 40.) Plaintiff's arterial deficiency produces consistent feet tingling. (AR 41.) Sitting cuts circulation off and causes leg discomfort. (AR 41.)

In caring for her husband, plaintiff claims she is able to only make sure he takes medication and eats and has clean clothing. (AR 41.) Plaintiff formerly changed her husband's leg dressing and pushed his wheelchair. (AR 41.) Plaintiff is unable to change dressings because she cannot get on the floor and her husband, at 300 pounds, is too heavy to lift. (AR 42.)

Sitting causes discomfort and tingling. (AR 43.) Plaintiff is able to walk up to 20 yards. (AR 43.) Plaintiff is able to stand to peel three or four potatoes before needing to sit down. (AR 43.) Plaintiff experiences difficulty to open a jar, crochet and perform needle work. (AR 44.) Plaintiff is able to write a check and complete applications. (AR 44.) Plaintiff experiences sleeping difficulty from heartburn and leg and back pain. (AR 45.) Plaintiff is able to drive but needs to stop to adjust back supports. (AR 45.) Plaintiff drives her husband three times a week for dialysis treatments. (AR 46.)

Plaintiff gets depressed to the point that she sits and cries in the shower. (AR 46.) Plaintiff takes Paxil which helps her depression. (AR 46.) Taking a shower is plaintiff's most physically demanding activity. (AR 47.) Plaintiff lies in bed to straighten her legs and spine to "get a little bit more flow in her legs." (AR 47.) Paxil can cause drowsiness to help plaintiff sleep. (AR 47.)

Plaintiff is unable to grocery shop because of leg and back pain, and her son and grandson shop for her. (AR 48.) Plaintiff is able to cook. (AR 48.)

Plaintiff experiences no problems with her medications. (AR 49.)

### *Vocational Expert Testimony At The October 25, 2000 ALJ Hearing*

Vocational expert Kenneth Ferra ("Mr. Ferra") testified at the October 25, 2000 ALJ hearing that plaintiff's work as a foods marketing associate and with the trucking and food service businesses was medium and semi-skilled. (AR 51.) As a first hypothetical, the ALJ asked Mr. Ferra to assume a person who: (1) is age 59; (2) has a fourth grade education; (3) has plaintiff's past relevant work experience; (4) has a combination of severe impairments; (5) retains residual functional capacity to lift and carry 50 pounds occasionally and 25 pounds frequently; (6) retains capacity to sit, stand and walk six to eight hours; (7) retains the residual functional capacity to understand, remember and carry out several

1   repetitive tasks; (8) retains ability to maintain attention and concentration for two-hour increments; (9)

2   is able to interact and relate to supervisors, coworkers and the general public; (10) is able to maintain

3   persistence and pace for two-hour increments; and (11) is able to maintain regular attendance. (AR 51.)

4   Mr. Ferra opined that a person with such limitations could perform plaintiff's past work. (AR 51.)

5          As a second hypothetical, the ALJ asked Mr. Ferra to assume a person who: (1) has the same

6   vocational parameter as the first hypothetical; (2) has a combination of severe exertional and non-

7   exertional impairments; (3) is unable to walk less than a block; (4) is unable to sit more the 10-15

8   minutes; (5) is unable to lift, push or pull; (6) is limited to perform simple, repetitive tasks; (7) is able

9   to maintain attention and concentration for two-hour increments; (8) is able to interact with supervisors,

10  coworkers and general public; (9) is able to maintain persistence and pace for two-hour increments; and

11  (10) is able to maintain regular attendance. (AR 52.)  Mr. Ferra opined that a person with such

12  limitations is unable to perform plaintiff's past relevant work or any other job which exists in the

13  national economy. (AR 52.)  Mr. Ferra further opined that no skills of plaintiff's semi-skilled work are

14  transferable to other jobs. (AR 52.)

15                  ***Plaintiff's August 24, 2004 ALJ Hearing Testimony***

16         Plaintiff testified at the August 24, 2004 ALJ hearing that she last worked for five years as a food

17  sales associate, which required her to call on customers, take and input orders into a computer, deliver

18  food products, attend meetings, and drive 500-700 miles per week. (AR 698-700.)  Plaintiff spent two

19  hours per day using a computer for data input. (AR 700.)  Plaintiff had a prior food service job which

20  required her to drive 500-700 miles and to deliver products to customers. (AR 701.)  Plaintiff had also

21  performed office work in her husband's business but was not paid. (AR 701.)

22         Plaintiff's husband died in April 2004, and she lives alone in a small apartment. (AR 702.) Prior

23  to her husband's death, plaintiff performed just about all housework, except "for walls, windows, and

24  carpeting." (AR 703.)  Plaintiff used a vacuum cleaner but was unable to finish a room. (AR 703.)

25  Plaintiff could vacuum for 15 minutes but needed to sit and rest five or ten minutes before resuming.

26  (AR 704.)  Plaintiff did her own cooking and dishes which was not too difficult during the last three or

27  four years of her husband's life if plaintiff stayed in one position. (AR 705.)  Plaintiff remained on her

28  feet 10-15 minutes and sat five to ten minutes before she resumed cooking. (AR 705.)  Plaintiff seldom

1   stayed erect or moving more than 15 minutes.  (AR 705.)  Plaintiff is able to sit an hour before needing

2   to get up and move.  (AR 706.)

3          Plaintiff estimated that during an eight-hour day, she is able to stand no more than two hours and

4   to sit 30 minutes.  (AR 718.)  Plaintiff later estimated that she able to sit for two hours.  (AR 718.)

5          Plaintiff is able to carry a bag of groceries in each hand but a five-pound bag of sugar is too

6   much.  (AR 706.)  Plaintiff carries a five-pound purse on her shoulder but five pounds in her hands is

7   too much because of arthritis or "something."  (AR 707.)  Plaintiff is able to lift/carry less than five

8   pounds.  (AR 718.)  Plaintiff has good grip strength and ability to use her fingertips but has difficulty

9   to open a jar.  (AR 707.)  Plaintiff's hobbies include knitting, crocheting and embroidery.  (AR 708.)

10          In the last four years, plaintiff's knees, hips, back and elbows have given her the most problems.

11   (AR 708.)  If plaintiff squats or kneels, she needs assistance to get back up because of her legs.  (AR

12   708-710.)  Plaintiff is able to lean over at the waist without assistance.  (AR 709.)  Plaintiff uses

13   "grabbers" to pick up something on the floor because of back pain.  (AR 709.)  Glucosamine

14   Chondroitin helps plaintiff's arthritis.  (AR 719.)  Medication has healed plaintiff's hiatal hernia.  (AR

15   719.)

16          Plaintiff was "shot" emotionally during the past four years and has been in good shape.  (AR

17   710.)  During March to July, 2002, two of plaintiff's step grandchildren died and her son died after she

18   took him off life support for AIDS.  (AR 710.)  Another of plaintiff's sons is incarcerated.  (AR 711.)

19   Plaintiff spends days in her apartment without coming out.  (AR 711.)  Plaintiff has experienced sleep

20   difficulties to require use of an over-the-counter sleep aid.  (AR 711-712.)  Plaintiff typically sleeps for

21   two or three hours, is awake for one or two hours, and falls back to sleep for another three or four hours.

22   (AR 712.)  Plaintiff is not refreshed during the day and frequently falls asleep when reading.  (AR 713.)

23   Plaintiff has trouble remembering, including her grandchildren's birthdays.  (AR 715.)  Paxil helps

24   plaintiff "a great deal."  (AR 719.)

25          In the 1½ years prior to the death of plaintiff's husband, plaintiff received nursing help for

26   plaintiff's husband, including dressings wounds and IV medications, and housekeeping help.  (AR 716.)

27   Plaintiff continued to cook for her husband, oversee his medications and perform family banking.  (AR

28   720.)

1    Plaintiff experiences no side effects from her medications.  (AR 719.)

2    ***Vocational Expert Testimony At The August 24, 2004 ALJ Hearing***

3    Vocational expert Linda Ferra ("Ms. Ferra") testified at the August 24, 2004 ALJ hearing that

4    plaintiff's sales representative work was semi-skilled and included general merchandising and customer

5    handling skills which are transferable to light retail.  (AR 722-723.)  As a first hypothetical, the ALJ

6    asked Ms. Ferra to assume a person who: (1) is age 63; (2) has a 12th grade education; (3) has past

7    relevant work experience such as plaintiff's; (4) has a combination of severe impairments; (5) retains

8    residual functional capacity to lift/carry 50 pounds occasionally and 25 pounds frequently; (6) retains

9    ability to stand, walk and sit six hours; (7) retains ability to perform detailed and simple, repetitive tasks;

10   (8) retains the ability to maintain attention and concentration; (9) retains the ability to maintain

11   persistence and pace; (10) retains the ability to relate to and interact with others; and (11) retains the

12   ability to adapt to usual changes in the work setting and to adhere to safety rules.  (AR 723.)  Ms. Ferra

13   opined that a person with such limitations could perform plaintiff's past work.  (AR 723.)

14   As a second hypothetical, the ALJ asked Ms. Ferra to assume a person who: (1) has the same

15   vocational perimeters as in the first hypothetical; (2) has a combination of severe impairments; (3)

16   retains residual functional capacity to sit five hours, stand two hours and walk one hour; (4) is able to

17   lift ten pounds frequently and 20 pounds occasionally; (5) is unable to use his/her hands for repetitive

18   pushing and pulling; (6) is unable to squat, climb, stoop, crouch or kneel; (7) is able to occasionally bend

19   and crawl; (8) must avoid exposure to unprotected heights; and (9) is able to handle occasional exposure

20   to moving machinery, marked temperature changes, dust, fumes, gases and noise.  (AR 723-724.)  Ms.

21   Ferra opined that a person with such limitations could not perform plaintiff's past work.  (AR 724.)

22   In response to questioning by plaintiff's attorney, Ms. Ferra testified that assuming a person with

23   a limitation to reasoning level one or two of Appendix C of the Dictionary or Occupational Titles, such

24   person could not perform plaintiff's past relevant work but could perform other medium work, including

25   stock handler and factory helper.  (AR 725-727.)  Plaintiff's attorney asked Ms. Ferra to further assume

26   that a hypothetical person has moderate restrictions in ability to respond appropriately to work pressures

27   in a typical work setting and moderate difficulties to respond appropriately to changes in a routine work

28   setting.  (AR 728.)  Ms. Ferra opined that such a person with such limitations would be unable to sustain

1   work in a competitive work environment.  (AR 728.)

2   **The ALJ's Findings**

3   In his September 16, 2004 decision, the ALJ identified the primary issue as whether plaintiff is

4   under a disability as defined in the Act. (AR 518.)  In concluding plaintiff failed to demonstrate inability

5   to perform her past relevant work and is not entitled to disability insurance benefits, the ALJ found:

6   1.   Plaintiff's peripheral arterial disease, incisional hernia, degenerative disc disease of the

7        lumbar spine, and a depressive disorder are severe but do not meet or medically equal an

8        impairment in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1.

9   2.   Plaintiff's allegations regarding her limitations are not credible.

10  3.   Plaintiff has the residual functional capacity to lift up to 50 pounds occasionally and to

11       lift/carry 25 pounds frequently and to sit, stand or walk for six hours in an eight-hour day.

12       Plaintiff has the mental capacity to perform detailed and simple repetitive tasks, to

13       maintain attention, concentration, persistence and pace, to relate to and interact with

14       others, to adapt to the usual changes in the work-place settings, and to adhere to safety

15       rules.

16  4.   Plaintiff's past relevant work as a sales representative driver did not require the

17       performance of work-related activities precluded by her residual functional capacity.

18  5.   Plaintiff's impairments do not prevent her to perform her past relevant work.  (AR 523-

19       524.)

20  **DISCUSSION**

21  **Standard Of Review**

22  Congress has provided limited judicial review of a Commissioner's decision made through an

23  ALJ. *See* 42 U.S.C. § 405(g).  A court must uphold the Commissioner's decision, made through an ALJ,

24  when the determination is not based on legal error and is supported by substantial evidence. *See Jones*

25  *v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985); *Sanchez v. Secretary of Health & Human Services*, 812

26  F.2d 509, 510 (9th Cir. 1987) (two consulting physicians found applicant could perform light work

27

28

17

1    contrary to treating physician's findings).[1]   Substantial evidence is "more than a mere scintilla,"

2    *Richardson v. Perales*, 402 U.S. 389, 402, 91 S.Ct. 1420 (1971), but less than a preponderance,

3    *Sorenson v. Weinberger*, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975).  Substantial evidence "means such

4    evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S.

5    at 401, 91 S.Ct. 1420; *Sandgathe*, 108 F.3d at 980.

6           The record as a whole must be considered, weighing both the evidence that supports and detracts

7    from the Commissioner's conclusion. *Sandgathe*, 108 F.3d at 980; *Jones,* 760 F.2d at 995.  If there is

8    substantial evidence to support the administrative finding, or if there is conflicting evidence that will

9    support a finding of either disability or nondisability, the finding of the Commissioner is conclusive.

10   *Sprague v. Bowen*, 812 F.2d 1226, 1229-1230 (9th Cir. 1987).  If the evidence is susceptible to more than

11   one rational interpretation, the court may not substitute its judgment for that of the Commissioner.

12   *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999); *Morgan v. Commissioner*, 169 F.3d 595, 599 (9th

13   Cir. 1999).

14          This Court reviews the ALJ's decision pursuant to 42 U.S.C. § 405(g) to determine whether it

15   is: (1) based on proper legal standards; and (2) supported by substantial evidence in the record as a

16   whole.  *Copeland v. Bowen*, 861 F.2d 536, 538 (9th Cir. 1988).  "A decision of the ALJ will not be

17   reversed for errors that are harmless." *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

18          Plaintiff bears the burden to prove that she is disabled which requires presentation of "complete

19   and detailed objective medical reports of her condition from licensed medical professionals." *Meanel*

20   *v. Apfel*, 172 F.3d 1111, 1113 (9th Cir. 1999) (citing 20 C.F.R. §§ 404.1512(a)-(b), 404.1513(d)).

21   Plaintiff must furnish medical and other evidence about plaintiff's medical impairments.  20 C.F.R. §§

22   404.1512(a), 416.912(a); ("[Y]ou must bring to our attention everything that shows that you are blind

23   or disabled."); 20 C.F.R. §§ 404.1514, 416.914 ("We need specific medical evidence to determine

24   whether you are disabled or blind.  You are responsible for providing that evidence.")

25   _____Here, plaintiff claims disability since April 3, 1998 due to her status post-aortal-femoral bypass

26   _____

27          [1]      "The district court properly affirms the Commissioner's decision denying benefits if it is supported by
     substantial evidence and based on the application of correct legal standards." *Sandgathe v. Chater*, 108 F.3d 978, 980 (9th

28   Cir. 1997).

1   surgery, ventral hernia, osteoarthritis, thyroid cancer, spastic colon, psorias, depression and anxiety. (AR

2   80, 518.) As discussed below, this Court finds that the ALJ properly evaluated the evidence and that his

3   conclusion that plaintiff is not disabled is based on proper legal standards and substantial evidence.

4   _____With the above standards in mind, this Court turns to plaintiff's criticism of the ALJ's September

5   16, 2004 decision.

6                                **Evaluation Of Dr. Manohara's Opinion**

7          The focus of plaintiff's challenge is the ALJ's evaluation of Dr. Manohara's opinion.  Plaintiff

8   contends the ALJ ignored Dr. Manohara's "complete opinion" and limitations and failed "to articulate

9   legally sufficient reasons to reject that opinion."  Plaintiff argues that the ALJ "impermissibly . . .

10  excluded portions of Dr. Manohara's opinion . . . to suit his desire to wrongfully deny the claim."

11         The Commissioner responds that the ALJ properly evaluated Dr. Manohara's opinion and

12  provided adequate reasons to discredit a part of Dr. Manohara's opinion.  The Commissioner contends

13  the ALJ properly discounted those portions of Dr. Manohara's opinion based on plaintiff's unsupported

14  claims.

15         The Ninth Circuit Court of Appeals distinguishes opinions among physicians who treat claimants

16  (treating physicians), who examine but do not treat claimants (examining physicians), and who neither

17  treat nor examine claimants (nonexamining physicians). *Lester v. Chater*, 81 F.3d 821, 839 (9th Cir.

18  1995).  As with treating physicians, an ALJ "must provide 'clear and convincing' reasons for rejecting

19  the uncontradicted opinion of an examining physician."  *Lester*, 81 F.3d at 830.  "And like the opinion

20  of a treating doctor, the opinion of an examining doctor, even if contradicted by another doctor, can only

21  be rejected for specific and legitimate reasons that are supported by substantial evidence in the record."

22  *Lester*, 81 F.3d at 830.  An ALJ may meet his obligation to set forth specific, legitimate reasons based

23  on substantial evidence in the record "by setting out a detailed and thorough summary of the facts and

24  conflicting clinical evidence, stating his interpretation thereof, and making findings."  *Magallanes v.*

25  *Bowen*, 881 F.2d 747, 753 (9th Cir. 1989); *Cotten v. Bowen*, 799 F.2d 1403, 1408 (9th Cir. 1986).  "The

26  ALJ must do more than offer his conclusions.  He must set forth his own interpretations and explain why

27  they, rather than the doctors', are correct."  *Embrey v. Bowen*, 849 F.2d 418, 421-422 (9th Cir. 1988).

28         Nonetheless, an ALJ may reject a physician's contradicted or uncontradicted opinion which is

                                                    19

1   "brief and conclusory in form with little in the way of clinical findings to support its conclusion."

2   *Magallanes v. Bowen,* 881 F.2d 747, 751 (9th Cir. 1989).   Inconsistencies and ambiguities in a

3   physician's opinion regarding disability may constitute specific, legitimate reasons to reject the opinion.

4   *Matney v. Sullivan*, 981 F.2d 1016, 1020 (9th Cir. 1992).   An ALJ may reject a physician's report based

5   on a claimant's exaggerated claims.  *See, e.g., Sandgathe*, 108 F.3d at 980.   The ALJ is responsible for

6   determining credibility and resolving conflicts in the medical testimony and ambiguities."  *Reddick v.*

7   *Chater*, 157 F.3d 715, 722 (9th Cir. 1998).

8         After reviewing the medical evidence, including Dr. Manohara's examination and assessment

9   (AR 519-521), the ALJ addressed plaintiff's depression:

10        In evaluating the evidence about the claimant's depression, weight is given to the general
          treating records, showing that the claimant's symptoms were treated with routine
11        prescription of anti-depressive and anti-anxiety medications, without referral for
          counseling.   Weight is given to the document results of January 2000 consultative
12        psychiatric evaluation, but the examiner's conclusion that the claimant had a GAF of 35
          is rejected, as is the limitation of the claimant to simple repetitive work.   These opinions
13        reflect an uncritical acceptance of the claimant's allegations about the extent of her
          depressive symptoms, but disregard her substantial accomplishments in coping with a
14        difficult situation, the serious chronic illness of her husband.   Greater weight is given to
          the October 2003 consultative psychiatric evaluation and to the examiner's conclusion
15        that the claimant, in spite of a depressive disorder, was able to understand, remember and
          carry out detailed instructions with no or minimal difficulty (Exhibit 17F).   (AR 522.)
16

17        Plaintiff focuses on Dr. Manohara's assessment that plaintiff would have moderate restrictions

18  in responding appropriately to work pressures in a usual work setting and moderate problems responding

19  appropriately to changes in a work setting.   Plaintiff ignores Dr. Manohara's concluding comment that

20  his "assessment is based on the self-report by the patient and to a lesser extent by the clinical findings

21  of mild to moderate depressed mood."  (AR 608.)  Dr. Manohara found plaintiff's thought process

22  logical and goal oriented with no evidence of thought disorder, hallucinations or delusions.  (AR 607.)

23  Dr. Manohara found plaintiff's affect appropriate to thought content and her memory, concentration,

24  cognitive function, judgment and insight generally intact.  (AR 607.) The clear inference is that the ALJ

25  concluded that Dr. Manohara's restrictions regarding work pressures and response to changes were based

26  on plaintiff's unsupported claims.   To that end, the ALJ rejected Ms. Ferra's testimony in response to

27  the hypothetical of plaintiff's attorney which included Dr. Manohara's restrictions at issue here.   The

28  ALJ noted the hypothetical was "based on medical evidence which is given little weight, or the

claimant's un-supported testimony." (AR 523.) An ALJ may properly "limit a hypothetical to those impairments that are supported by substantial evidence in the record." *Osenbrock v. Apfel*, 240 F.3d 1157, 1165 (9th Cir. 2001). An ALJ may so limit a hypothetical even when medical evidence conflicts. *Magallanes*, 881 F.2d at 756. "An ALJ is free to accept or reject restrictions in a hypothetical question that are not supported by substantial evidence." *Osenbrock*, 240 F.3d at 1165; *see Magallanes*, 881 F.2d at 756-757. The parameters of an ALJ's hypotheticals need not "include any alleged impairments that the ALJ has rejected as untrue." *Long v. Chater*, 108 F.3d 185, 188 (8th Cir. 1997). An ALJ is not bound to accept restrictions in a hypothetical question of claimant's counsel. *Martinez v. Heckler*, 807 F.2d 771, 773 (9th Cir. 1986).[2]

Of particular note, the ALJ found plaintiff's "allegations regarding her limitations are not credible." (AR 524.) Plaintiff fails to challenge such finding. Plaintiff admitted that Paxil helps "a great deal" and that she experiences no side effects. (AR 719.) Moreover, "[i]t is not necessary to agree with everything an expert witness says in order to hold that his testimony contains 'substantial evidence.'" *Russell v. Bowen*, 856 F.2d 81, 83 (9th Cir. 1988). The ALJ properly considered Dr. Manohara's finding as a whole in addition to the other evidence, including plaintiff's testimony, regarding her mental condition and treatment. The ALJ rejected restrictions regarding work pressures and response to changes in that they were based on medical evidence worthy of little weight and unsupported testimony. Although the ALJ's rejection could have been more express, it is no mystery, especially when reading the decision as a whole. *See Magallanes*, 881 F.2d at 755 (ALJ's failure to "recite the magic words" does not deprive a reviewing court's "faculties for drawing specific and legitimate inferences from the ALJ's opinion.") The ALJ sufficiently set out a detailed and thorough summary of the facts and evidence, stated his interpretation thereof, and made findings to preclude reversal or remand requested by plaintiff.

## CONCLUSION AND ORDER

For the reasons discussed above, this Court finds no error in the ALJ's analysis and that the ALJ

---

[2]    Since the ALJ found plaintiff is able to perform her past relevant work, the need for Ms. Ferra's testimony is questionable. *See Matthews v. Shalala*, 10 F.3d 678, 681 (9th Cir. 1993).

1   properly concluded plaintiff is not disabled.  This Court further finds the ALJ's decision is supported

2   by substantial evidence in the record as a whole and based on proper legal standards. Accordingly, this

3   Court DENIES plaintiff's request to reverse the Commissioner's decision to deny plaintiff disability

4   insurance benefits or to remand for further proceedings.  This Court DIRECTS the Court's clerk to enter

5   judgment in favor of defendant Jo Anne B. Barnhart, Commissioner of Social Security, and against

6   plaintiff Barbara J. Eritano and to close this action.

7          IT IS SO ORDERED.

8   **Dated:    November 16, 2005**              **/s/ Lawrence J. O'Neill**
    66h44d                                       UNITED STATES MAGISTRATE JUDGE

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28